UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Crim. No. 18-Cr-10319-LTS |
| | ) |
| JOHN TAVARES, | ) |
| | ) |
| Defendant. | ) |

**<u>SENTENCING MEMORANDUM</u>**

Although only 34 years old, John TAVARES ("TAVARES") has spent much of his life in the criminal justice system.  By age 14, TAVARES was adjudicated delinquent for shoplifting and threatening to commit murder.  PSR ¶ 81.  The next year, at age 15, TAVARES was adjudicated delinquent for breaking and entering a motor vehicle, larceny over $250, possession of controlled substances, and trespassing.  PSR ¶¶ 82-84.  Later, while still a juvenile, TAVARES was adjudicated delinquent for breaking and entering, vandalizing property, and possession of burglarious tools.  PSR ¶ 85.

Upon becoming an adult, TAVARES's criminal activities continued unabated.  By age 18, TAVARES was convicted of unlawfully possessing a firearm with a defaced serial number and assaulting a police officer.  PSR ¶ 87.  Two years later (and after having spent time in state custody), TAVARES (at age 20) was convicted of possession with intent to distribute controlled substances and illegally possessing a firearm.  PSR ¶ 88.  After serving another term of incarceration, TAVARES (at age 25) was once again convicted of illegally distributing controlled substances.   PSR ¶ 89.

Now, TAVARES is awaiting sentencing for distributing a prodigious amount of cocaine.  Over approximately 18 months, TAVARES and his girlfriend/co-defendant Cristina LOPEZ

("Lopez") received more than 40 kilograms of cocaine from Puerto Rico, which they then distributed. While engaged in this activity, TAVARES also illegally possessed firearms.

TAVARES is facing a mandatory minimum sentence of 15 years. However, because he is also a career offender, his advisory guideline sentencing range ("GSR") is 292 - 325 months. The Government recommends that TAVARES be sentenced to a term of imprisonment within this sentencing guideline range. In making this recommendation, the Government recognizes that this will result in a very lengthy term of incarceration. Nonetheless, it is warranted given TAVARES's repeated drug trafficking. TAVARES's prior incarcerations have done nothing to dissuade him from continuing to engage in criminal activities, nor did the support TAVARES received from a former Harvard University (and current Columbia University) professor.

Indeed, if anything, TAVARES's previous incarcerations appear only to have emboldened him. After serving multiple state incarcerations, TAVARES graduated from being a retail drug dealer to becoming a significant wholesale cocaine supplier. In little more than a year's time, TAVARES and Lopez developed a major cocaine supply conduit from Puerto Rico to Southeast Massachusetts through which flowed more than a million dollars' worth of cocaine.

Equally important, TAVARES's drug-trafficking operation involved firearms, a potentially dangerous and lethal combination. Agents seized firearms, which were together with ammunition and drugs, from two different residences – one of which (the Ink Block apartment) was principally used by TAVARES. Additionally, agents seized a CD from Lopez's residence that contained hundreds of family photographs interspersed with photographs of TAVARES showing off various firearms and drug proceeds. *See* Exhibit 1.

In short, TAVARES was a significant drug wholesaler, who regularly possessed firearms. He is also an unrepentant career offender. Imposition of a lengthy guidelines sentence is

necessary not only to punish TAVARES, but also to protect society from TAVARES and to promote respect for the rule of law.

## I.     FACTUAL BACKGROUND

For roughly 18 months, TAVARES was an active participant in a conspiracy that distributed a massive quantity of cocaine from Puerto Rico to Massachusetts. Between March 2017 and August 2018, TAVARES and Lopez arranged for at least 44.9 kilograms of cocaine to be shipped via the United States mail from Puerto Rico to Massachusetts. More than 20 cocaine parcels were sent from Puerto Rico to Lopez's residence, where Lopez or one of her children received the parcels. Another 17 cocaine parcels were addressed to Lopez and delivered to apartments where TAVARES resided. *See generally* PSR ¶¶ 9-65, 71.

While the vast majority of the cocaine parcels were sent to addresses controlled by Lopez and TAVARES, Lopez also arranged for various friends and family members to receive the parcels. For example, Lopez's sister (Elizabeth) received four cocaine parcels from Puerto Rico, *see* PSR ¶¶ 17.d, 21, 25, and Lopez's son received two parcels, *see* PSR ¶¶ 17.e, 21. When Lopez was not home, a teenager took possession of a cocaine parcel that arrived in the mail. *See, e.g.,* PSR ¶¶ 59-60.

After collecting the parcels sent to her residence and/or to various family members or friends, Lopez took the parcels to various locations that TAVARES and she maintained. There, TAVARES and Lopez opened the parcels, removed the cocaine, and prepared the cocaine for distribution.

Lopez and TAVARES used multiple residences in furtherance of their conspiracy: (1) Lopez's personal residence at 27 Downie Street in North Dartmouth, Massachusetts ("the Lopez Residence"); (2) 1227 Sea Street, Apartment 1, in Quincy, Massachusetts ("the Quincy

Residence"), where TAVARES resided until late May 2018; (3) 611 Bridge Street in Weymouth, Massachusetts ("the Weymouth Residence), where TAVARES resided from June 2018 through his arrest in August 2018; and (4) 300 Harrison Avenue, Apartment 347, Boston, Massachusetts ("the Ink Block Apartment"), which was used by both TAVARES and Lopez.

The drug trafficking operation was highly profitable. Investigators seized more than $90,000 in cash from the Weymouth Residence where TAVARES was arrested. PSR ¶ 57.

Firearms were a known and necessary part of TAVARES's illegal activities. During the August 18, 2018 search of Lopez's residence, agents seized CDs containing hundreds of photographs apparently taken from LOPEZ's phone. *See* PSR ¶ 64. Interspersed among family photographs were, *inter alia,* photographs of TAVARES posing in a bedroom with rifles, one of which was equipped with a silencer and photographs of TAVARES with large stacks of cash (with and without firearms). *See* Exhibit 1.

During the searches of two of the residences associated with TAVARES and Lopez, agents recovered firearms (together with cocaine) and ammunition. From the Ink Block apartment (which contained a considerable amount of TAVARES's clothing), agents seized one firearm (a Sig Sauer P226 handgun bearing serial number U643300). This firearm was in a silver tray in the kitchen, along with two magazines containing approximately 20 rounds of ammunition, and five plastic bags containing cocaine (two bags containing approximately 319 grams) and cocaine base (three bags containing approximately 60.96 grams of cocaine base). PSR ¶ 62*; see* Exhibit 2. Agents also recovered a scale, drug ledgers, various items in TAVARES's and Lopez's names, and a document reflecting a breakdown in cash (presumably of drug proceeds) which read: *"45,000 – Cris; 39,000 me."*[1]  PSR ¶ 62.

---

[1] At the Lopez Residence, investigators seized from a locked safe in Lopez's bedroom

## II.     SENTENCING GUIDELINE ANALYSIS

The Probation Office first determined that a conservative estimate of the amount cocaine for which TAVARES should be held accountable was 44.9 kilograms (which results in a base offense level of 32). PSR ¶ 71. The Probation Office also determined that a two-level increase pursuant to USSG § 2D1.1(b)(1) was warranted given the recovery of a firearm and drugs from the Ink Block apartment. PSR ¶ 72.

These two findings resulted in an adjusted offense level of 34. However, the Probation Office also concluded that TAVARES was a career offender (given his two previous controlled substances offenses) and that his adjusted offense level was therefore 37 pursuant to USSG § 4B1.1(b)(1). *See* PSR ¶ 77. After reducing this total by two levels for acceptance of responsibility,[2] *see* PSR ¶ 78, the Probation Office concluded that TAVARES's Total Offense Level was 35. *See* PSR ¶ 79.

---

closet: a Glock 30 .45 caliber handgun bearing serial number RUG463; 19 rounds of ammunition; 15 plastic baggies containing 122.17 grams of cocaine; five plastic baggies containing 8.81 grams of cocaine base; and $8,126 in U.S. currency. *See* PSR ¶ 63. (At Lopez's sentencing, Lopez claimed that the gun and drugs inside the safe were her son's.)

At the Weymouth Residence (where TAVARES was arrested), investigators seized more than $90,000 in cash, more than two kilograms of cocaine, a money counter, multiple scales (with cocaine residue), other drug paraphernalia, and a drug ledger from the Weymouth Residence. *See generally* PSR ¶¶ 56-58. No firearms were recovered at this residence.

[2] As the Probation Office noted at paragraph 78, footnote 19 in the PSR, the Government is not moving for a third-level reduction per USSG § 3E1.1(b) as TAVARES did not plead guilty until four days before trial was scheduled to begin. By that time, the Government had done a considerable amount of trial preparation, including, *inter alia,* marking exhibits, subpoenaing witnesses, preparing jury instructions, and filing a trial memorandum, *see, e.g.,* ECF Dkt. 80, 81, 82, 85. *See generally United States v. Fuentes-Echevarria,* 856 F.3d 22, 25 (1st Cir. 2017).

Because TAVARES was a career offender, the Probation Office found that TAVARES had a criminal history category of VI and determined that his advisory guideline sentencing range was therefore 292 – 365 months.[3]  PSR ¶ 132.

### III.    SENTENCING RECOMMENDATION

A lengthy guidelines sentence is warranted in this case.  TAVARES and Lopez successfully established a pipeline between Puerto Rico and Massachusetts through which flowed a substantial quantity of cocaine.  Working together, TAVARES and Lopez used the United States Postal Service as their unwitting courier to transport safely more than 40 kilograms of cocaine.  For roughly 18 months, they received the cocaine parcels, and they arranged for other family members to receive the parcels on their behalf.  After receiving and/or collecting the cocaine parcels, TAVARES and Lopez then broke down and distributed the drugs.  TAVARES and Lopez also traveled to Puerto Rico to arrange for additional kilogram shipments of cocaine.

TAVARES's crime was not motivated by youthful indiscretion.  It was not a function of addiction, nor was it the result of a momentary lapse in judgment.  To the contrary, TAVARES's criminal activity was just another step in his journey through the criminal justice system.

Unlike many of the defendants who appear for sentencing before this court, TAVARES has little to offer in mitigation.  He is 34 years old and grew up in an intact family until he was 13 years.  TAVARES himself describes his childhood as "okay," albeit with a "strict" father.

---

[3] Absent the career offender guideline, TAVARES's advisory guideline sentencing range would have been determined as follows:  (1) Total Adjusted Offense Level of 32, *see* PSR ¶¶ 76 (Adjusted Offense Level of 34), 78 (two-level reduction for acceptance of responsibility); (2) a criminal history category of IV, *see* PSR ¶ 94; and (3) advisory GSR of 180-210 months, *see* USSG Ch. 5, Part A, and § 5G1.1(c)(2) (requiring that the bottom of the guideline range not be lower than any statutorily required minimum sentence).

PSR ¶ 107.  TAVARES is in good health, with no known mental health.  Other than regularly consuming marijuana, he has no drug or alcohol dependency issues.  PSR ¶¶ 118-119, 120, 124.

TAVARES participated in a formal re-entry program sponsored by Harvard University, *see* PSR ¶¶ 122-123, and he then participated in a research project with the sponsor of the program (for which he was paid), *see* PSR ¶ 127.  Despite his continued participation in the program as a guest speaker until his arrest (PSR ¶ 127), TAVARES apparently was an advocate of the *"do as I say, not as I do"* school of thought as his criminal actions belie any suggestion of change or of lessons learned.

Under the circumstances, imposition of a sentence within the applicable GSR is necessary and appropriate in this case.  TAVARES deserves to be punished for his role in a drug-trafficking operation that delivered more than 44 kilograms of cocaine.  The photos in Exhibit 1 capture TAVARES's true nature:  he is a dangerous drug trafficker, who kept firearms to protect his drug stash and drug proceeds.  Efforts at rehabilitation have proven unsuccessful.  The statutory considerations set forth in § 3553(a)—including, *inter alia,* the seriousness of the offense, the need for both specific and general deterrence, and the need not to create unwarranted disparities—all support imposition of a substantial sentence of incarceration.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   */s/ James E. Arnold*
      JAMES E. ARNOLD
      NADINE PELLEGRINI
      Assistant U.S. Attorneys
      1 Courthouse Way, Suite 9200
      Boston, MA 02210
      (617) 748-3603/(617) 748-3261

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for the defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).

                                            */s/James E. Arnold*
                                            JAMES E. ARNOLD
                                            Assistant United States Attorney

Date: February 24, 2022.